23CA2086 Peo v Breackenridge 05-07-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA2086
City and County of Denver District Court No. 21CR4122
Honorable A. Bruce Jones, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Manuel Breackenridge,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE J. JONES
Lum and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 7, 2026

---

Philip J. Weiser, Attorney General, Alejandro Sorg Gonzalez, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Dilyn K. Myers, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1 Defendant, Manuel Breackenridge, appeals the judgment of conviction entered on a jury verdict finding him guilty of felony menacing. He contends that the evidence was insufficient to support his conviction and that the district court erred by failing to suppress his incriminating statements. We disagree with both contentions and therefore affirm.

## I. Background

¶ 2 Breackenridge and J.B. leased a commercial kitchen to prepare items for their respective food businesses. The cleanliness of the kitchen had been a sore point before the underlying incident.

¶ 3 On the day in question, J.B. and her husband — the victim — arrived at the kitchen to find it in a state of disarray. J.B. called Breackenridge to ask him to come in and clean up the mess, and Breackenridge apologized and said he would be in later. J.B. and the victim put some things back in order and began to work in the kitchen.

¶ 4 When Breackenridge arrived, J.B. and the victim greeted him, but Breackenridge expressed hostility at the state of the kitchen and accused them of making the mess. A verbal altercation ensued between Breackenridge and the victim. Eventually, Breackenridge

1

removed a gun from its holster, racked the gun to load a bullet in the chamber, put the gun back in his pocket, and walked toward the victim and said, "I have a concealed carry. Don't fuck with me."

¶ 5 The People charged Breackenridge with felony menacing. At trial, Breackenridge asserted defense theories of general denial and self-defense. The jury found him guilty as charged, and the district court sentenced him to two years of probation.

## II. Sufficiency of the Evidence

¶ 6 Breackenridge argues that the prosecution failed to present sufficient evidence to prove that (1) he made a threat or physical action that placed the victim in fear of serious bodily injury; or (2) if such threat or physical action occurred, the victim was in fear of imminent serious bodily injury. We aren't persuaded.

### A. Applicable Law and Standard of Review

¶ 7 To satisfy due process, the prosecution is required to prove all elements of a crime beyond a reasonable doubt. *Montez v. People*, 2012 CO 6, ¶ 21 (first citing U.S. Const. amend. XIV, § 1; and then citing Colo. Const. art. II, § 25). A person commits the crime of menacing "if, by any threat or physical action, he or she knowingly places or attempts to place another person in fear of imminent

serious bodily injury." § 18-3-206, C.R.S. 2025. At the relevant time, menacing was a class 3 misdemeanor but was elevated to a felony offense if committed

> (a) By the use of a deadly weapon or any article used or fashioned in a manner to cause a person to reasonably believe that the article is a deadly weapon; or
>
> (b) By the person representing verbally or otherwise that he or she is armed with a deadly weapon.

§ 18-3-206(1)(a), (b), C.R.S. 2021.

¶ 8    "In determining whether the defendant knowingly placed or attempted to place another person in fear of imminent serious bodily injury, the proper focus is on the intent and conduct of the actor, not of the victim." *People v. Shawn*, 107 P.3d 1033, 1035 (Colo. App. 2004). "The prosecution need only prove the defendant was aware that his or her conduct was practically certain to cause fear." *Id.*

¶ 9    We review sufficiency of the evidence claims de novo to determine whether the evidence presented was sufficient in both quality and quantity to sustain a conviction. *McBride v. People*, 2022 CO 30, ¶ 38; *People v. Roggow*, 2013 CO 70, ¶ 13. "In so

3

doing, we must determine whether the relevant evidence, when viewed as a whole in the light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charges beyond a reasonable doubt." *Roggow*, ¶ 13. "A verdict cannot rest on guessing, speculation, conjecture, or a mere modicum of relevant evidence." *McBride*, ¶ 38.

¶ 10 "An appellate court may not serve as a thirteenth juror and consider whether it might have reached a different conclusion than the jury." *People v. Harrison*, 2020 CO 57, ¶ 33. Instead, we afford the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence, and, where reasonable minds could differ, deem the evidence sufficient to sustain a conviction. *Thomas v. People*, 2021 CO 84, ¶ 10; *People v. Alemayehu*, 2021 COA 69, ¶ 18.

¶ 11 "It is the fact finder's role to weigh the credibility of witnesses, to determine the weight to give all parts of the evidence, and to resolve conflicts, inconsistencies, and disputes in the evidence." *People v. Poe*, 2012 COA 166, ¶ 14. Therefore, we won't disturb jury determinations on issues of credibility and weight "unless the

4

evidence is legally insufficient to support a finding of guilt beyond a reasonable doubt." *People v. Padilla*, 113 P.3d 1260, 1261 (Colo. App. 2005).

¶ 12    "Where there is a video recording of the relevant events, however, we are in the same position as the jury to determine whether the video supports or contradicts a witness' testimony." *People v. Liebler*, 2022 COA 21, ¶ 21.  "That is because the nature of the evidence presented in the video does not depend on an evaluation of credibility or a weighing of disputed facts; rather, it presents indisputable visual evidence . . . ." *Id.*

## B.    Analysis

¶ 13    At trial, the prosecution introduced a recording from the kitchen's surveillance camera, which showed the following events. After Breackenridge and the victim engaged in a verbal argument, Breakenridge removed a gun from its holster and tossed the holster onto a metal table, where it clattered noisily.  Breackenridge then turned his body partly away from the victim and racked the gun to load a bullet in its chamber.  Breackenridge's body wasn't positioned such that it completely blocked the gun from view, and the recognizable sound of a gun being racked could be heard

throughout the kitchen. Breackenridge returned the unholstered gun to his pocket and collected the holster. While walking toward, and looking at, the victim, Breackenridge said that he had a gun and told the victim to not "fuck with me."

¶ 14 The victim testified that, after he had returned to his workstation in the kitchen, he saw Breackenridge pull a gun out of his pocket and that he saw and heard him rack the gun. He said that Breackenridge then walked toward him and told him that he had a gun and not to fuck with him.

¶ 15 The victim testified that Breackenridge's actions and words were very threatening and that "the intention [he] got was [Breackenridge] wanted to murder [him] right then." The victim said that it was "a pretty disturbing thing when someone does that to you" and that he believed Breackenridge "was threatening to kill [him]." The victim was "[v]ery scared, very worried," and "frightened," and he said that the experience "was one of the more fearful times in [his] life."

¶ 16 A recording from a police body camera that captured an interview of the victim on the day of the incident was admitted into evidence. The victim's recorded statements to the police regarding

the underlying incident were generally consistent with his trial testimony.

¶ 17    J.B. testified that she saw Breackenridge take a gun out of his pocket and heard him rack it.  She said that Breackenridge pulled the gun out during "a little bit of a lull in the argument" when she and the victim had gone "back to work, and [she] was trying to focus on that and stay out of the way and try to deescalate the situation as much as possible."  J.B. felt scared when she saw the gun.  Breackenridge's cousin also testified that she saw Breackenridge pull out a gun and yell at the victim when leaving the kitchen.

¶ 18    Last, the prosecution introduced a recording from a police body camera that showed Breackenridge being detained after the incident.  Breackenridge falsely told the officers that he didn't pull out his gun during the confrontation with the victim.

¶ 19    Viewing this evidence in the light most favorable to the prosecution and affording the prosecution the benefit of every reasonable inference that may be drawn therefrom, we conclude that it was sufficient for a reasonable jury to find beyond a reasonable doubt that, by threat or physical action, Breackenridge

placed or attempted to place the victim in fear of imminent serious bodily injury. *See People v. Caldwell*, 43 P.3d 663, 672 (Colo. App. 2001) ("If the prosecution presents evidence from which the trier of fact may properly infer the elements of the crime, the evidence is sufficient to sustain the conviction."); *People v. Perez*, 2016 CO 12, ¶ 31 (In a sufficiency of the evidence inquiry, "[a] court must not invade the province of the jury by second-guessing its conclusion when the record supports the jury's findings.").

¶ 20     The surveillance footage shows (1) within the sight and earshot of the victim, Breackenridge removing a gun from its holster and racking the gun to put a bullet in the chamber; (2) Breckenridge walking toward the victim while possessing the unholstered, racked gun; and (3) Breackenridge telling the victim that he had a concealed weapon and not to fuck with him. *See Shawn*, 107 P.3d at 1035; *see also People v. Hines*, 780 P.2d 556, 558-59 (Colo. 1989) (the making of a conditional or contingent threat while holding a weapon in the presence of another was sufficient to constitute felony menacing); *People v. Lopez*, 2015 COA 45, ¶¶ 11-15 (evidence was sufficient to support a menacing conviction where

the defendant told the victim officer he had a knife, and he lifted up his shirt).

¶ 21 The police body camera footage also recorded Breackenridge's false statement to the police that he didn't pull out his gun. *See People v. Summitt*, 132 P.3d 320, 324 (Colo. 2006) ("Proof that after the charged crime the accused acted in ways apparently calculated to avoid detection, arrest, prosecution, or conviction is often relevant in suggesting a guilty mind." (quoting 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 85, at 420 (1994))); *see also People v. Phillips*, 219 P.3d 798, 800 (Colo. App. 2009) ("An actor's state of mind is normally not subject to direct proof and must be inferred from his or her actions and the circumstances surrounding the occurrence."); *People v. Miralda*, 981 P.2d 676, 679 (Colo. App. 1999) ("Intent may . . . be established from circumstantial evidence and from the inferences that may reasonably be drawn from those circumstances.").

¶ 22 Breackenridge argues, in part, that the evidence instead supports a finding that he didn't commit felony menacing because he was acting in self-defense. But, "[w]hen self-defense is an affirmative defense, the defendant generally admits the commission

of the elements of the charged act, but seeks to justify the act."
*Castillo v. People*, 2018 CO 62, ¶ 39.  Thus, a self-defense theory
would undermine his argument that the evidence was insufficient to
prove that he committed the substantive elements of felony
menacing.

¶ 23    Moreover, by finding Breackenridge guilty, the jury necessarily
determined that the prosecution had disproved his self-defense
theory beyond a reasonable doubt.  *See People v. Mosely*, 2021 CO
41, ¶ 21 (by finding the defendant guilty of the charged offense, the
jury necessarily found that the prosecution had proved the
elements of the offense beyond a reasonable doubt); *see also*
*Roberts v. People*, 2017 CO 76, ¶ 22 (when the evidence raises the
issue of an affirmative defense, the affirmative defense becomes an
additional element of the charged offense, which the prosecution
must disprove beyond a reasonable doubt).  Breackenridge doesn't
assert that the evidence was insufficient to support the jury's
finding on that element.

## III.  Motion to Suppress

¶ 24    Breackenridge next contends that the district court reversibly
erred by denying his pretrial motion to suppress his incriminating

statements, and by consequently allowing their admission at trial, because the statements were impermissibly elicited while he was in custody and subject to interrogation in violation of his constitutional rights and *Miranda v. Arizona*, 384 U.S. 436 (1966). We disagree.

A.     Applicable Law and Standard of Review

¶ 25     To protect a defendant's Fifth Amendment right against self-incrimination, *Miranda* prohibits the prosecution from introducing statements procured by custodial interrogation unless police officers have first advised the defendant of their rights. *Marko v. People*, 2018 CO 97, ¶ 35; *People v. Matheny*, 46 P.3d 453, 462 (Colo. 2002). *Miranda* protections apply only if a defendant is subject to both custody and interrogation. *Marko*, ¶ 35; *Mumford v. People*, 2012 CO 2, ¶ 12.

¶ 26     A person is in custody for *Miranda* purposes "whenever his freedom of action is curtailed to a degree associated with formal arrest." *People v. Mangum*, 48 P.3d 568, 571 (Colo. 2002).

¶ 27     "A suspect is interrogated, for purposes of determining whether *Miranda* warnings are required, whenever the suspect 'is subjected to either express questioning or its functional

equivalent.'" *People v. Madrid*, 179 P.3d 1010, 1014 (Colo. 2008) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). In other words, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. We consider the totality of the circumstances when determining whether an officer interrogated a suspect. *People v. Bonilla-Barraza*, 209 P.3d 1090, 1094 (Colo. 2009).

¶ 28    Typically, suppression cases involve a mixed question of fact and law. *Id.* We defer to a court's factual findings if competent evidence in the record supports them, and we review the court's legal conclusions de novo. *Id.* "Whether an individual has been subjected to custodial interrogation in violation of *Miranda* is a question of law that we review de novo." *People v. Klinck*, 259 P.3d 489, 493 (Colo. 2011).

¶ 29    But, "where the statements sought to be suppressed are audio- and video-recorded, and there are no disputed facts outside the recording controlling the issue of suppression, we are in a

12

similar position as the trial court to determine whether the statements should be suppressed." *Madrid*, 179 P.3d at 1014. "Thus, we may undertake an independent review of the audio or video recording to determine whether the statements were properly suppressed in light of the controlling law." *People v. Kutlak*, 2016 CO 1, ¶ 13.

¶ 30     Because Breackenridge preserved this issue, we review any error in the court's denial of his motion to suppress his incriminating statements for constitutional harmless error. *Niemeyer v. People*, 2024 CO 58, ¶¶ 20, 50; *Hagos v. People*, 2012 CO 63, ¶ 11. Under this standard, we reverse if there is a reasonable possibility that the error might have contributed to the conviction. *Niemeyer*, ¶¶ 20, 50; *Hagos*, ¶ 11.

## B.     Additional Facts

¶ 31     At a motions hearing, a police corporal testified that he responded to the victim's report that a gun had been involved in a dispute between the victim and Breackenridge. Officers found Breackenridge in his car and told him to get out of the vehicle and to walk backwards toward them. The corporal approached Breackenridge and placed him in handcuffs. The corporal testified

13

that, at that time, Breackenridge was just being detained, rather than placed under arrest, because the corporal didn't have enough information to determine whether or not the victim's report was "unfounded" and to determine what crime, if any, had been committed.

¶ 32    Police body camera footage showed that, after Breackenridge was handcuffed, an officer told the corporal that Breackenridge had a gun in his front pocket. In response, Breackenridge said, "Yeah, I have a concealed." The corporal replied, "Yup, and you can't pull it out at work." Breackenridge said, "I didn't pull it out. I just said I had a concealed. The guy was getting in my face."

¶ 33    While the corporal and the officer were later discussing whether Breackenridge committed menacing or flourishing, Breackenridge said, "But I don't understand what I did wrong." The corporal said, "You can't pull a gun out." Breackenridge replied, "I didn't pull it out on him." The corporal explained that the victim reported that Breackenridge had pulled a gun on him and that, if Breackenridge wanted to provide his side of the story, he could do so after he had received a *Miranda* advisement.

¶ 34    The corporal testified that he didn't anticipate a response to his comments and wasn't attempting to elicit statements from Breackenridge.  He clarified, "That's why I made [it] a statement and not a question."  The corporal explained that he has found that he can de-escalate a situation by providing individuals with the reasons for why the police are contacting them.

¶ 35    The district court denied Breackenridge's motion to suppress his incriminating statements, finding that he wasn't in custody and that the statements were voluntarily given, and not the result of interrogation.  The prosecution introduced the body camera footage at trial and played the recording during closing argument.

### C.    Analysis

¶ 36    Assuming, without deciding, that Breackenridge was in custody, we conclude that he wasn't subject to an interrogation when he made the incriminating statements.  Because neither party argues that the corporal engaged in express questioning, we look to whether his exchange with Breackenridge constituted the functional equivalent of questioning.

¶ 37    First, we aren't convinced that the corporal's comment that Breackenridge wasn't allowed to pull out his weapon, made in

15

response to Breackenridge's statement that he had a concealed weapon, could be perceived as an interrogation. *See Bonilla-Barraza*, 209 P.3d at 1094 (The totality of the circumstances inquiry "focuses on whether the officer reasonably should have known that the officer's words or actions would cause the suspect to perceive that he or she was being interrogated."); *see also Madrid*, 179 P.3d at 1015 (The defendant's incriminating statements weren't the product of an interrogation where the defendant initiated the exchange with the detective and the detective's statements "appear to be an explanation of why [the defendant] was being interviewed.").

¶ 38    And we aren't persuaded that the corporal should have known that his offhand comment was reasonably likely to elicit Breackenridge's statement that he hadn't pulled out his concealed weapon. *See Bonilla-Barraza*, 209 P.3d at 1094 (The totality of the circumstances inquiry also focuses on whether the officer's words or actions "were calculated to elicit incriminating statements."); *see also Innis*, 446 U.S. at 294-95, 303 ("[W]e cannot say that the officers should have known that it was reasonably likely that [the defendant] would . . . respond" to their stated concern that children

might find a missing gun because "the entire conversation appears to have consisted of no more than a few off hand remarks," "[t]his [wa]s not a case where the police carried on a lengthy harangue in the presence of the suspect," and "the record [does not] support the [defendant's] contention that, under the circumstances, the officers' comments were particularly 'evocative.'"); *cf. People v. Rivas*, 13 P.3d 315, 319 (Colo. 2000) ("A suspect's inculpatory statement is not considered to be the product of custodial interrogation merely because it is made after he has been told the charges against him.").

¶ 39    Indeed, the officer explained that he provided Breakenridge with the reason for his detention to de-escalate the situation. *See Innis*, 446 U.S. at 301 n.7 (while the interrogation inquiry primarily focuses on the perceptions of the suspect, an officer's intent does have relevance as to whether the officer should have known that their words or actions were reasonably likely to evoke an incriminating response).

¶ 40    Finally, we note that, when Breakenridge later expressed confusion as to what he had done wrong, the corporal again told him that he wasn't allowed to pull out his gun, and Breakenridge

repeated the same incriminating statement that he hadn't done so. *See Rivas*, 13 P.3d at 319-20 (noting that "an officer's direct response to a question initiated by a suspect generally [does not] constitute interrogation, even though the suspect is in custody and has already invoked his right to counsel," and holding that the defendant wasn't interrogated because "truthfully responding to the defendant's question [as to what charges were being filed] cannot be objectively characterized as a ploy to evoke an incriminating response").

¶ 41　　Accordingly, we conclude that the district court didn't err by denying Breackenridge's motion to suppress his incriminating statements because he wasn't subject to the functional equivalent of questioning at the time he made the statements. *See People v. Gonzales*, 987 P.2d 239, 241 (Colo. 1999) ("[T]he Fifth Amendment and *Miranda* do not prohibit the evidentiary use of volunteered, non-compelled statements made by a suspect in the absence of counsel.").

### IV.　Disposition

¶ 42　　The judgment of conviction is affirmed.

JUDGE LUM and JUDGE MEIRINK concur.

18